NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
JULIE J. SHEMITZ (Cal. Bar No. 224093)
JAMIE A. LANG (Cal. Bar No. 253769)
PUNEET V. KAKKAR (Cal. Bar No. 259816)
Assistant United States Attorneys
Organized Crime Drug Enforcement Task Force Section
        1400 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-5735/2652/5728
        Facsimile: (213) 894-0142
        E-mail:    julie.shemitz@usdoj.gov
                   jamie.lang@usdoj.gov
                   puneet.kakkar@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>                  v.<br><br>MEHRAN KHALILI,<br><br>            Defendant. | No. CR 14-00521(A)-JAK<br><br>TRIAL: DIRECT TESTIMONY OF MICHAEL BROWNING<br><br>Trial Date:    August 21, 2018<br>Location:      Courtroom of the<br>               Hon. John A.<br>               Kronstadt |

DECLARATION OF MICHAEL BROWNING

I, Michael Browning, declare as follows:

1.   I am a Special Agent ("SA") with Immigration and Customs Enforcement ("ICE") – Homeland Security Investigations ("HSI").   I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

2.   I am currently assigned to the HSI Los Angeles Border Enforcement Security Task Force ("BEST") Inland Highways Group, which addresses a broad range of threats to United States border security, and trade, financial, and immigration systems.   I have been a Special Agent since graduating in March 2012 from the Federal Law Enforcement Training Center ("FLETC") upon completion of ICE Special Agent Training and the Criminal Investigator Training Program ("CITP").   During my tenure as a Special Agent with HSI, I have served as the case agent and in a support capacity on investigations of narcotics and financial crimes.   I am familiar with the tactics, techniques, and procedures individuals use to conceal their criminal activity, which includes evading cash reporting requirements and trade-based money laundering methods including the black market peso exchange.

3.   I am one of the case agents assigned to United States v. Pacific Eurotex, et al., CR 14-521(A)-JAK.   I have been involved in most aspects of the federal investigation in this matter.

**Overview of Investigation of Pacific Eurotex Corporation**

4.   In May 2013, ICE-HSI Los Angeles, in conjunction with the Internal Revenue Service Criminal Investigation ("IRS-CI") and the Los Angeles Interagency Metropolitan Police Apprehension Crime Task Force ("LA IMPACT"), began investigating a money laundering scheme

involving the Los Angeles Fashion District (the "Fashion District").
In sum, during this time, Fashion District garment stores were
suspected of receiving narcotics proceeds as payment for goods sent
to customers in Mexico, that they either knew or deliberately avoided
knowing, were the proceeds of narcotics trafficking.  Pacific Eurotex
Corporation ("Pacific Eurotex"), located at 1433 South Griffith
Avenue, Los Angeles, California, was one of the companies that we
were investigating.

5.   At the start of the investigation, in May 2013, HSI
conducted an educational outreach in the Fashion District.  HSI
visited several businesses and informed them that, among other
things, the delivery of United States currency as payment for open
invoices was a method of money laundering used by drug traffickers
and other illicit actors.  HSI agents also advised businesses in the
Fashion District that companies must file a form reporting the
receipt of currency over $10,000 for a single transaction or related
transactions.  HSI Special Agents Simon Porter and Panuchai
Praditbatuga conducted this outreach with Pacific Eurotex on May 13,
2013.

6.   During this investigation HSI utilized a confidential
informant ("CI") who acted as a money consolidator for "peso
brokers."  In that capacity, the CI was responsible for collecting
and distributing narcotics proceeds.  As part of his/her role as a
money consolidator in Southern California, the CI had delivered money
(including narcotics proceeds) to businesses in the Fashion District,
including Pacific Eurotex.

7.   As part of the investigation in the Fashion District, HSI,
with the aid of the CI, introduced an undercover agent ("UCA") to act

as a narcotics proceeds courier (i.e., in place of the CI).  After May 2013, whenever the CI reported that he/she had a delivery of cash for Pacific Eurotex, HSI arranged for the UCA to drop off the cash. Based on instructions from the CI, the UCA delivered cash to Pacific Eurotex on four instances, each time on behalf of a customer of Pacific Eurotex:  May 30, 2013 (in the amount of $50,000, on behalf of "Abraham Dichy"), June 7, 2013 (in the amount of $70,000, on behalf of "Mayer"), August 1, 2013 (in the amount of $100,000, on behalf of "Mayer"), and August 9, 2013 (in the amount of $149,935, on behalf of "Mayer").

**Discovery of Double Bookkeeping Scheme Regarding Max Diaz Sales**

8.   On September 10, 2014, HSI executed a search warrant at the premises of Pacific Eurotex.  Among other things, we found a folder with papers inside, a copy of which is attached hereto as Exhibit 3. The label on the folder is "Max/Mayer."  (Ex. 3, PEC_012092.)  The folder included various paperwork, including printed ledgers with handwriting and invoices.  For example, inside the folder was a one-page handwritten ledger with a title of "MAYER/AMBE."  (Ex. 3, PEC_012106 [with post-it note]-PEC_012107 [without post-it note].) Additionally, inside the folder was a printed, five-page spreadsheet of transactions for "Customer Name:  Max Diaz."  (Ex. 3, PEC_012099-PEC_012102, PEC_012104) (hereinafter the "Max Diaz Ledger").  All three cash drops by the UCA for "Mayer" are recorded on the Max Diaz Ledger.  (Ex. 3, PEC_012100, PEC_12102 in the "Payment" column.)[1]

---

[1] With respect to the $149,935.00 cash drop that occurred on August 9, 2013, I believe that is reflected on the Max Diaz Ledger as a payment on "8/9/2014" for "149,935.00" (Ex. 3, PEC_012100) and that the "2014" is a typographical error, as it is amongst entries in 2013 and is for the same amount of money that was dropped off on August 9, 2013 by the UCA.

3

Based on my review of the Max Diaz Ledger, I believe that it is a running balance for accounts payable for the customer "Max Diaz" (also known as "Mayer," later identified as one Mayer Ambe from Mexico), whereby Pacific Eurotex recorded purchases and payments for this customer and specified whether those payments were made by cash, check, or wire transfer.

9.   As part of the execution of the search warrant at Pacific Eurotex, HSI also seized and imaged a server that had software known as "MOD2." I worked with the software developer of MOD2, who assisted HSI in accessing Pacific Eurotex's MOD2 files. Thereafter, I reviewed Pacific Eurotex's MOD2 files, which included (among other things) sales and inventory invoices and packing slips for customers of Pacific Eurotex.

10.   Based on my review of Pacific Eurotex's MOD2 files, I believe that Pacific Eurotex falsified the value of certain sales to Max Diaz in its MOD2 files, specifically, the sales that are recorded on the Max Diaz Ledger (as reflected in the "Amount" column of that ledger). Based on my review of the MOD2 files, I believe that while Pacific Eurotex recorded the quantity of merchandise sold to Max Diaz on MOD2, it kept the values of almost all of its sales to Max Diaz as "zero" on MOD2. Instead, Pacific Eurotex maintained the value of most sales to Max Diaz (corresponding to the Max Diaz Ledger, as reflected in the "Amount" column of that ledger) in separate files found on another Pacific Eurotex computer. I believe this based on the following:

a.   For all of the invoices identified on the Max Diaz Ledger (as reflected in the "Invoice #" column), I found copies of

those corresponding invoices (i.e., with the same invoice number and sales amount) on another Pacific Eurotex computer, not in MOD2.

      b.   In MOD2, the value of sales for almost all of the sales/transactions recorded on the Max Diaz Ledger (as reflected in the "Amount" column of that ledger and captured in the corresponding invoices found on another Pacific Eurotex computer) is $0.00.

      c.   The MOD2 database did, however, include invoices corresponding to the sales/transactions recorded on the Max Diaz Ledger, but the invoices in MOD2 essentially only reflected the quantity of units sold (and therefore, reduction of inventory).

      d.   The payments of cash that are recorded on the Max Diaz Ledger (as reflected in the "Amount" column of that ledger) are not recorded in MOD2.

11.   One such example of this practice, i.e., how Pacific Eurotex accounted for the number of units sold to "Max Diaz" (and reduction of its inventory), but falsified the value of those sales (by recording the sales as "zero") in MOD2, is the transaction that is at line 12 of the Max Diaz Ledger, at Exhibit 3, PEC_012099 (highlighted in yellow).  Line 12 of the Max Diaz Ledger records a sale of "$77,728.39," with "Invoice # PE-32713."

12.   On the aforementioned Pacific Eurotex computer, I found a copy of what I believe to be the invoice listed at line 12 of the Max Diaz Ledger, a copy of which is attached hereto as Exhibit 63.  As reflected in Exhibit 63, this invoice reflects the same information as line 12 of the Max Diaz Ledger -- an invoice amount of $77,728.39, with Invoice Number PE-32713.  Exhibit 63 also reflects that the quantity of units sold was 64,594.70.

13.   MOD2, by contrast, contained a different version of this invoice.  As an initial matter, I could not locate an invoice with number "PE-32713" in MOD2.  However, I found an invoice with number PE-0010672 that had many of the same entries as Exhibit 63 (which was found on the Pacific Eurotex computer and matched line 12 of the Max Diaz Ledger), including the quantity of units sold, 64,594.70, and the description of goods sold.  A copy of this invoice, found in MOD2, is attached hereto as Exhibit 64.  As reflected in Exhibit 64, however, there is one key difference between the invoice found on the Pacific Eurotex computer and the invoice found in MOD2 – the invoice found in MOD2 reflects total sales of $0.00.  The revision history (a copy of which is attached hereto as Exhibit 65) for the MOD2 invoice (Exhibit 64) shows that all of the prices for the units sold on this invoice were changed to "$0.00."

**Cash Received for Max Diaz Sales Corresponding to Amounts Deposited in Account 3136**

14.   As part of this investigation, co-case agent SA Eugene Jenks of IRS-CI reviewed bank account records for Wells Fargo Bank account ending in 3136 in the name of Mojgan Neman, with power of attorney held by Morad Neman.  SA Jenks identified this account as part of a larger financial investigation into the principals of Pacific Eurotex, and paid further attention to this account because of the pattern of deposits less than $10,000.  For March 22, 2013 to December 2013, the total amount of United States currency deposited into the Wells Fargo Bank account number 3136 was approximately $1,538,820.  The total amount of cash recorded on the Max Diaz Ledger for that same time period was approximately $1,614,449.  This similarity in amounts, in addition to the pattern of structured

6

1   deposits into this account noted by SA Jenks, leads me to believe

2   that the cash payments recorded in the Max Diaz Ledger were likely

3   deposited into Wells Fargo Bank account number 3136.

4       I declare under penalty of perjury under the laws of the United

5   States of America that the foregoing is true and correct and that

6   this declaration is executed at Los Angeles, California, on July 13,

7   2018.

MICHAEL BROWNING